E-FILED
Friday, 10 May, 2013  03:25:39 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

_____

| | | |
|---|---|---|
| ROY FLUKER, | ) | |
| and | ) | |
| DEBRA FLUKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 11-CV-2254 |
| v. | ) | |
| | ) | |
| COUNTY OF KANKAKEE, | ) | |
| and | ) | |
| KANKAKEE COUNTY | ) | |
| SHERIFF'S OFFICE, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## OPINION

This case is a § 1983 action by a prisoner who was seriously injured when the correctional officer driving his prison transport vehicle was required to brake suddenly, causing the prisoner to hurtle forward and hit his head on a metal divider. The case is before the court on Defendants' Motion for Summary Judgment (#63), Plaintiffs' Motion to Voluntarily Dismiss (#69), and Plaintiffs' Objections To and Appeal of Order (#81). Following a careful review of the briefs and evidence filed, Plaintiffs' Motion to Voluntarily Dismiss (#69) is DENIED; Plaintiffs' Objections to Order (#81) are DENIED; and Defendant's Motion for Summary Judgment (#63) is GRANTED.

### Factual background

In May 2010, Plaintiff Roy Fluker ("Plaintiff") was convicted of federal charges. (#70 ¶ 1). Between February 11, 2011, and July, 2011, Plaintiff was temporarily held in custody at the Jerome Combs Detention Center ("JCDC"). (#70, ¶¶ 2-3). On June 14, 2011, at approximately 4:00pm, after a visit to a doctor's office located off the JCDC grounds, Plaintiff was placed in a transport van to be taken back to the JCDC. (#63, #70 ¶ 9). Officers Matt Meehan and Chantal Montalvo were the two correctional officers transporting Plaintiff; Meehan was the driver, and Montalvo sat in the front passenger seat. (#63, #70 ¶ 10). The back of the transport van contained, among other details not relevant here, two long benches, one of which has six seatbelts. (#63, #70 ¶¶ 12-13; #63, Downey Dep. exh. E, pp 56-57). Plaintiff's hands were cuffed in front of him and attached to a chain around his waist, and his ankles were chained together. (#72 ¶ 11). He was seated on one of the benches and was not secured by any seatbelt, even though seatbelts were available. (#63, #70 ¶¶ 13). Plaintiff did not request to be seatbelted. (#63, #70 ¶¶ 16-17). There is no official JCDC policy on whether inmates should be secured by seatbelt. (#63, #70 ¶ 20). There is neither a policy nor a practice of informing inmates that they may choose to be seatbelted. (#63, #70 ¶¶ 20-21). Neither of the parties avers that inmates have previously requested to be seatbelted, but neither party avers that Defendants maintained a policy or practice to refuse to seatbelt inmates. (#63, #70 ¶¶ 21-22). Before the incident in question, the Chief of Corrections had discussed the policy of seatbelting inmates and had determined that there were administrative, security, and safety reasons for not mandating seatbelt usage, (#63, #70 ¶ 23), and that the transporting officers had the discretion to determine whether an inmate's

request to be seatbelted was to be granted, (#63, #70 ¶ 22). The Chief of Corrections testified that if an inmate requested a seat belt, he expected the request would be granted. (#63 ex. E p. 79).

     The parties disagree as to whether Meehan was driving too quickly for the road conditions, or whether he was driving erratically. While driving, Meehan braked abruptly to avoid an accident with the car ahead of the van. (#63, #70 ¶ 29). Due to this maneuver, Plaintiff slid off the bench, hitting his head against a metal surface inside the van. (#63, #70 ¶ 34). Montalvo heard a loud thump in the back of the transport van. (#63, #70 ¶ 35). Montalvo turned behind her, (#63, #70 ¶ 35), and due to a metal grating between the driver's seats and the rear holding area, (#63 exh. F), she saw that Plaintiff was bleeding profusely from his head, (#72 ¶ 9). Montalvo told Plaintiff not to move, and to stay down until someone could attend to his medical needs. (#63, #70 ¶ 37). At 4:30pm, within a minute of the incident, Montalvo called her supervisor, Lieutenant Kent Smith, for instructions, while Meehan resumed driving. (#63, #70 ¶¶ 39-41). Montalvo had an exchange with Smith, which went as follows:

> Montalvo:   Hey. Meehan had to stop kind of fast and Mr. Fluker fell and he's bleeding.
>
> Smith:       Like did he need stitches?
>
> Montalvo:   I don't know. He's bleeding. I can't see him and we're not going to stop. Do you know what I mean?
>
> Smith:       All right. When you get here, we'll have Tatum check him out.
>
> Montalvo:   All right, bye.

(#73 ¶ 31). The transport van arrived at the jail about 7-10 minutes later. (#63, #70 ¶ 44). Officer Tatum, a trained first responder, first assessed Plaintiff and then cleaned and bandaged the laceration on Plaintiff's head. (#63, #70 ¶ 58). Plaintiff was then transported to Provena St.

Mary's Hospital for further evaluation, arriving at 5:11pm. (#63, #70 ¶ 63). Plaintiff was

examined via X-ray, CT scan, and MRI. (#63, #70 ¶ 64). Plaintiff was informed that his vertebra

had been fractured, and was transferred to Riverside Hospital where he underwent fusion surgery

two days later. (#63, #70 ¶ 65).

      The JCDC Policy and Procedure Manual contains the following policies:

> 20. Emergency Procedures:
> A. Any emergency encountered while transporting inmates will be
> handled on an individual basis at the discretion of the Officer handling the
> transport.
>
> [ * * *]
>
> G. In the event that an inmate requires emergency medical attention during
> a transport the following will apply:
>     1) The Officer handling the transport will notify KanCom or ISP of the
>     situation and request backup and an ambulance.
>     2) When only one Officer is present the Officer will follow the
>     ambulance in the transport vehicle.
>     3) The Officer handling the transport will then notify the JCDC shift
>     supervisor of the emergency as soon as possible.

(Jerome Combs Detention Center Policy and Procedure Manual 316-Transports, #63 exh. G).

      In the middle of July 2011, Plaintiff was transferred out of the JCDC. (#74, p.6; #78, p.

3). In August 2011, he was sentenced to 15 years in a federal penitentiary, (#63, #70 ¶ 4), and is

currently incarcerated at Devens Federal Medical Center in Massachusetts, (#63, #70 ¶ 5).


### Procedural posture

      On September 28, 2011, Plaintiff filed his original complaint in Kankakee County Circuit

Court, against the County of Kankakee and the Kanakee County Sheriff's Office (collectively,

"Defendants"). (#1). This complaint did not name any individual defendants, but rather referred

to Unknown Officer One and Two. (#1). The complaint alleged: (1) one claim of willful and wanton conduct, ostensibly pursuant to state common law, although the complaint does not explicitly indicate so; and (2) one claim of violating Plaintiff's Eighth Amendment rights pursuant to 42 U.S.C. § 1983. (#1).

On October 25, 2011, Defendants removed the case to this court. (#1). On December 5, 2011, Magistrate Judge David G. Bernthal entered a discovery order, which required, among other things, that: pleadings were to be amended by March 9, 2012; additional parties were to be joined by March 9, 2012; fact discovery was to be completed by June 1, 2012; Plaintiff shall disclose experts and provide expert reports by June 15, 2012 and make such experts available for deposition by July 15, 2012; Defendants shall disclose experts and provide expert reports by August 15, 2012, and make such experts available for deposition by September 15, 2012; all discovery, including deposition of experts, was to be completed by September 15, 2012; and all case-dispositive motions were to be filed by October 31, 2012. (#12).

On December 7, 2011, Defendant Kankakee County Sheriff's Office ("KCSO") filed its Answer and Affirmative Defenses, (#13), and on the same day, Defendant County of Kankakee ("KC") filed a Motion to Dismiss (#14). On December 27, 2011, Plaintiff filed his Reply to Defendants' affirmative defenses, (#16), and a Response to the Motion to Dismiss, (#17).

On March 9, 2012, Plaintiff filed an Amended Complaint, which still did not name any of the individual defendants, but added Plaintiff's wife, Debra Fluker ("Debra") and through her, two more claims: (3) loss of consortium from willful and wanton conduct; and (4) loss of consortium from the alleged Eighth Amendment violation, pursuant to § 1983. (#26).

On March 30, 2012, Defendant KCSO filed its Answer to Plaintiffs' Amended Complaint and Affirmative Defenses. (#28). On the same day, Defendant KC filed a Motion to Dismiss Plaintiff's Amended Complaint. (#29). On March 30, 2012, Defendants KCSO and KC filed a Motion to Dismiss Count IV of Plaintiff's Amended Complaint. (#31). Because Plaintiffs' Amended Complaint (#26) superseded his original Complaint (#1), and because Defendants' original Motion to Dismiss (#14) referenced the original Complaint, Magistrate Judge David G. Bernthal found the Motion to Dismiss (#14) to be moot, in a text order on April 13, 2012. On April 20, 2012, Plaintiffs filed another Reply to Defendants' Affirmative Defenses. (#39).

On June 1, 2012, Judge Bernthal filed his Report and Recommendations, recommending that this court grant Defendants' Motion to Dismiss Count IV of Plaintiffs' Amended Complaint, but denying the motion as to the remainder of the Amended Complaint. (#41). On July 25, 2012, this court accepted the Report and Recommendation. (#44). On July 31, 2012, following a joint Motion for Extension of Time to Complete Discovery, (#40), Judge Bernthal granted that Motion by text order, extending the deadline to complete fact and medical discovery to September 14, 2012. On September 6, 2012, Defendant KC filed its Answer to Plaintiff's Amended Complaint and Affirmative Defenses to Counts I-III of the Amended Complaint. (#47). On September 7, 2012, Judge Bernthal entered a text order extending Plaintiffs' deadline to disclose experts to September 30, 2012.

On September 7, 2012, Defendant KCSO filed a Motion for Leave to File an Additional Affirmative Defense. (#48). On September 24, 2012, Plaintiffs filed a brief Response, in which the only argument they raised was that "Defendant Kankakee County Sheriff's Office has failed to raise this affirmative defense seasonably and this affirmative defense may be deemed waived

under Fed. R. Civ. P. 8(c)." (#49 ¶ 2). On October 25, 2012, Judge Bernthal entered an Order

granting the Motion to Amend, which stated, in pertinent part, as follows:

> Plaintiffs do assert they were prejudiced by the untimely filing of the County's
> exhaustion of administrative remedies…. As to the exhaustion of administrative
> remedies defense, Plaintiffs do not specify what additional discovery they
> require, beyond the entire jail record that they already received from the County,
> in order to determine whether Roy Fluker exhausted his administrative remedies.
> The Court, therefore, finds that Plaintiffs are not prejudiced by the late filing of
> the exhaustion of remedies defense and denies Plaintiffs' motion to strike on
> timeliness grounds.

(#59).

On November 29, 2012, Defendants filed their Motion for Summary Judgment. (#63). On

February 4, 2013, Plaintiffs filed a Motion for Leave to File Second Amended Complaint to add

named defendants, (#68), and a Motion to Voluntarily Dismiss, (#69), in order to exhaust his

administrative remedies. On April 4, 2013, Judge Bernthal entered an order denying Plaintiffs'

Motion for Leave to File Second Amended Complaint. (#79). On April 18, 2013, Plaintiff filed

an objection to the Order, which was self-styled as a Motion for Reconsideration, Objections to,

and Appeal of Order. (#81). On May 6, 2013, Defendants filed their Response. (#82).

This Opinion now proceeds by addressing the three outstanding motions: Plaintiffs'

Objection to Magistrate Judge's Order, (#81); Plaintiffs' Motion to Voluntarily Dismiss, (#69);

and Defendants' Motion for Summary Judgment, (#63).


**Plaintiffs' Objection to Magistrate Judge's Order Denying Motion to Amend Complaint**

Plaintiffs have filed an Objection (#81) to the Magistrate Judge's Order (#79) denying

their Motion for Leave to Amend (#68). Plaintiffs have twice attempted to add the two transport

officers as individual defendants, along with claims against them. Plaintiffs had tried, in their

first attempt, (#53), to add these defendants in order to avoid the burden of proving the existence

of a policy, custom, or usage pursuant to *Monell* liability, *Powe v. City of Chicago*, 664 F.2d 639,

643 (7th Cir. 1981), but that motion was denied without prejudice, (#59). That Order noted:

> [T]o the extent Plaintiffs seek to amend in order to address *Monell* liability, the
> requirements for local government liability established in *Monell*, as explained
> above, are not a defense but part of Roy Fluker's § 1983 claim against the
> County. Plaintiffs can hardly claim surprise at the proposition that they must
> prove the elements of their claim against Defendants, and Plaintiffs fail to
> explain why justice requires that the Court grant them leave to amend now.
> Plaintiffs may file a motion for leave to amend that better explains why they
> seek to add additional defendants and allegations, and why they should be
> granted leave to do so. At present, Plaintiffs' request for leave to amend is
> denied.

(#59 pp. 6-7) (internal citation omitted).

Later, in their second attempt, Plaintiffs sought again to amend their complaint, (#68),

and that motion was again denied, (#79). The Order read, in pertinent part, as follows:

> Plaintiffs' efforts in seeking leave to amend have not been diligent. This Court
> set March 9, 2012, as the deadline for adding parties. Although Federal Rule of
> Civil Procedure 15 instructs that courts "should freely give leave when justice
> so requires," where a party seeks leave to amend after the Court's deadline for
> amendments have passed, the moving party must show "good cause." "In
> making a Rule 16(b) good-cause determination, the primary consideration for
> district courts is the diligence of the party seeking amendment." Despite this
> Court's invitation in October 2012 to file a motion to amend with more
> explanation in support, Plaintiffs waited to do so until February 2013, well after
> Defendants filed their motion for summary judgment. Moreover, Plaintiffs'
> explanation for why they waited is unpersuasive. That Defendants have
> disavowed the existence of a policy or practice that would give rise to liability
> under *Monell* should not come as a surprise to Plaintiffs.

(#79, p.3) (internal citations omitted). In this Objection, Plaintiffs challenge that Order. In effect,

Plaintiffs complain that it was unfair that Judge Bernthal permitted Defendant KCSO to amend

its affirmative defenses after the deadline to do so, while he did not permit them to amend their complaint after their deadline. Plaintiffs argue that "[t]his Court must hold the Plaintiffs to the same liberal standard for 'good-cause' and diligence. If the Defendants were free of any good-cause scrutiny in taking ten months to file their PLRA affirmative defenses, then the Plaintiffs must be held to the same standard." (#81 p. 3).

A preliminary question is whether the order to which Plaintiffs object is a dispositive or a nondispositive order. This question is relevant because the standard of review depends on that distinction. The Federal Rules of Civil Procedure provide that when parties object to a magistrate judge's order, district judges are to review nondispositive decisions for clear error and dispositive rulings *de novo*. Fed. R. Civ. P. 72. The question is whether the denial of a motion to add parties and claims can be considered "dispositive", since the denial of such a motion would, in this specific case, effectively deny Plaintiffs a chance at making an individual liability claim, thereby acting like a Rule 12(b)(6) dismissal. Rule 72(a) refers to a nondispositive matter as one that is "not dispositive of a party's claim or defense", whereas Rule 72(b) treats as a dispositive matter one that is "dispositive of a claim". Fed. R. Civ. P. 72. Magistrate judges may be designated to hear and determine any pretrial matter pending before the court, "except a motion for injunctive relief, for judgment on the pleadings, for summary judgment, to dismiss or quash an indictment or information made by the defendant, to suppress evidence in a criminal case, to dismiss or to permit maintenance of a class action, to dismiss for failure to state a claim upon which relief can be granted, and to involuntarily dismiss an action." 28 U.S.C. § 636(b)(1)(A). Further, Local Rule 72.1 does not specifically define dispositive as compared to nondispositive motions, but instead, incorporates by reference the definition in § 636(b)(1)(A). Accordingly,

because a motion to amend is not among the proscribed motions in § 636(b)(1)(A) and is not, on its face (rather, here, only in effect), dispositive of a claim, the Magistrate Judge's Order denying Plaintiff's Motion to Amend will be treated as nondispositive and therefore will be reviewed only for clear error. *See Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 595 (7th Cir. 2006).

This court has carefully reviewed the Magistrate Judge's Order and finds that it is neither clearly erroneous nor contrary to law. Judge Bernthal correctly stated Rule 15(a)(2)'s mandate to give leave to amend when justice so requires, and correctly stated Rule 16(b)(4)'s limitation on modifying a schedule only for good cause and with the court's consent. Judge Bernthal also correctly stated that "[i]n making a Rule 16(b) good-cause determination, the primary consideration for district courts is the diligence of the party seeking amendment." *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011). Finally, Judge Bernthal correctly applied the facts of this case to the law.[1]

---

[1] To the extent that Plaintiffs claim unfair surprise or unequal application of the law, those arguments are unconvincing. In their Response to Defendant's Motion for Summary Judgment, Plaintiffs argue that fact discovery closed on September 14, 2012, before Defendants filed their affirmative defense.  (#70 pp. 34, 37 n. 3). But this is irrelevant. While the deadline for fact discovery was extended to September 14, 2012, (Text Order of July 31, 2012), Defendants filed their Motion for Leave to File an Affirmative Defense of failure to exhaust on September 7, 2012, (#48). That motion was filed at that time because, as the Motion states, "Plaintiff Roy Fluker has not come forward with any evidence during discovery indicating that he exhausted his administrative remedies as required under the PLRA." (#48 ¶ 4). Thus, although exhaustion is a statutory requirement, and although an affirmative defense must be timely claimed, Plaintiffs cannot argue that they did not have notice after September 7, 2012. Further, Plaintiffs never requested an extension of time to conduct *fact* discovery relative to this issue, although they had requested an extension to complete *expert witness* discovery. In response to that motion, this court has liberally extended discovery deadlines and modified scheduling orders to serve the ends of justice. *See, e.g.*, (#61) (extending expert discovery deadlines upon Plaintiffs' motion). In that same Order, the court noted that Plaintiffs requested an order that Defendants provide a copy of Plaintiff's "medical records in an adequate size of print and print quality", but subsequent denied that motion because "Plaintiffs' attorneys fail to indicate what efforts they have made, on their own, to request a more readable copy….Without such information, the Court does not find it appropriate to order such relief and DENIES this request without prejudice." Plaintiffs have not argued that they needed more time to conduct fact discovery on the exhaustion defense.

Plaintiffs further object that the Order failed to address their motion to add a cause of action against the driver of the transport van for negligent operation of the van. This objection is without merit. Because the addition of a proposed party was denied, a cause of action against that proposed party is also implicitly denied. Plaintiffs' Objection (#81) is accordingly denied.[2]

## Plaintiffs' Motion to Voluntarily Dismiss

After Defendants filed their Motion for Summary Judgment, arguing, among other things, that Plaintiff failed to exhaust his administrative remedies under the PLRA, Plaintiff filed their Motion to Voluntarily Dismiss. Plaintiffs argue that they should be permitted to pause the litigation (by means of dismissing it), exhaust his administrative remedies by completing the grievance process, and then return to the present litigation having satisfied that requirement. As will be discussed below, the provided reasons are not persuasive. Further, because Plaintiffs' claims fail on the merits, an adjudication of this motion is incidental to the ultimate outcome of this case.

Plaintiffs argue that "[d]ismissal for failure to exhaust is without prejudice and so does not bar the reinstatement of the suit unless it is too late to exhaust," *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002), and that "[a] dismissal for failure to exhaust administrative remedies is normally without prejudice, thus giving the prisoner an opportunity to exhaust his remedies and refile his suit at a later date." *Robinson v. United States*, 80 F. App'x 494, 500 (7th Cir. 2003) (citing *Walker*). Plaintiffs state that the JCDC Inmate Handbook does not provide for

---

[2] Although not argued, the relation-back doctrine does not apply because Plaintiffs have not pled any of the requisite elements in Federal Rule of Civil Procedure 15(c). *See generally Hall*, 469 F.3d at 595.

any time limit on an inmate's right to file a grievance. (#74 exh. 1). Defendants respond that it is

in fact too late to exhaust because the rules in the Inmate Handbook "are applicable to all

inmates confined at the JCDC for the entire period that [the inmate is] in the facility's legal

custody and apply to time spent outside the facility for appointments, court appearances, etc."

(#74 exh. 1 p. 1). Plaintiffs reply that administrative remedies were unavailable to him due to

movement out of the JCDC, and due to the fact that he had been hospitalized and was recovering

from the cervical spine fusion surgery as a result of Defendants' actions. Plaintiffs argue that

because the administrative remedies were unavailable, he was therefore not required to exhaust

them. Plaintiffs also argue that it is "nonsensical" that Defendants simultaneously claim that the

JCDC handbook policies no longer apply to him and that the grievance procedures as discussed

in the handbook do apply to him, and that "Defendants cannot use the JCDC handbook policies

as both a shield and a sword." (#78 p.4). This court has reviewed the arguments and the law.

Following this careful review, this court denies the Motion to Dismiss.

Plaintiffs spend the bulk of their brief arguing that the motion to dismiss should be

granted without prejudice, and less of it arguing whether the motion should even be granted.

They appear to attempt to frame the issue as being based on the PLRA's exhaustion requirement.

42 U.S.C. § 1997e(a); *Walker v. Thompson*, 288 F.3d 1005, 1009 (7th Cir. 2002) ("Dismissal for

failure to exhaust is without prejudice and so does not bar the reinstatement of the suit unless it is

too late to exhaust.") However, because the motion at bar is to voluntarily dismiss, the applicable

standard is Federal Rule of Civil Procedure 41, pertaining to the dismissal of actions, rather than

the PLRA. A plaintiff may voluntarily dismiss without a court order as long as the opposing

party has not served an answer or a motion for summary judgment, or all parties agree to

dismiss. Fed. R. Civ. P. 41(a)(1)(A). In all other situations, "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Not only was the Motion to Dismiss filed after Defendants filed both their Answer and Motion for Summary Judgment, Defendants clearly do not stipulate to the dismissal.

A district court "has the discretionary power to deny a plaintiff's request to voluntarily dismiss a claim without prejudice." *Tolle v. Carroll Touch, Inc.*, 23 F.3d 174, 177 (7th Cir. 1994). "[D]ismissal should be allowed unless the defendant will suffer some plain legal prejudice other than the mere prospect of a second lawsuit." *Stern v. Barnett*, 452 F.2d 211, 213 (7th Cir. 1971). Plaintiffs argue that "legal prejudice" does not occur solely because a dispute remains unresolved, or a defendant would be inconvenienced by having to defend in another forum, or a plaintiff would gain a tactical advantage by that dismissal. *Smith v. Lenches*, 263 F.3d 972, 976 (9th Cir. 2001). However, "[s]ome of the factors justifying denial are the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and the fact that a motion for summary judgment has been filed by the defendant." *Pace v. S. Exp. Co.*, 409 F.2d 331, 334 (7th Cir. 1969). Each of those factors is present here.

This litigation, brought by Plaintiffs, has been ongoing for a year and a half. Discovery, consisting of multiple lengthy depositions, at what must have been significant effort and expense, have already been conducted. Plaintiffs have filed six motions for extension of time, (#33, 34, 35, 46, 65, and 67), whereas Defendants have filed only one, (#27). As far as this court can tell, Plaintiffs' only explanation for why Plaintiff Roy Fluker failed to file a grievance and exhaust his administrative remedies is that "the first time that Plaintiffs even knew Defendants

were challenging Plaintiffs' claims under the PLRA was October 26, 2012". (#78 pp. 1-2). It is somewhat suspect that counsel would not think about satisfying the statutory requirements of 42 U.S.C. § 1997e(a) until an affirmative defense was raised; *ignorantia juris non excusat* is fundamental black letter law. It is even more suspect for counsel to be notified that he or she is facing a dismissal for failing to comply with those requirements and yet neglect to immediately seek further discovery, file a motion to voluntarily dismiss—or, most strangely, actually file a grievance. And, finally, Plaintiffs filed the present motion only after Defendants filed their Motion for Summary Judgment. All of the *Pace* factors are satisfied.

Plaintiffs argue that there would be no prejudice and that allowing them to dismiss "would not give [them] the 'push refresh button'… [but] would merely allow [them] to comply with the grievance process, re-file the case in the event the grievance process proves futile, and begin the litigation right where it left off—summary judgment." (#78 p. 2). Had Plaintiffs filed this motion shortly after Defendants filed their amended affirmative defenses and before their Motion for Summary Judgment (or, for that matter, had Plaintiffs attempted to file a grievance at any point), this court might have looked on the motion with more leniency. *Hill v. Potter*, 352 F.3d 1142, 1145-46 (7th Cir. 2003) ("If… through ignorance of proper procedures a plaintiff jumps the gun, suing before he has exhausted his administrative remedies, [the suit] can be dismissed as premature, at least if the opposing party has not been harmed by the premature filing of the suit, and hence without prejudice."). But here, Defendants have been put at great trouble and expense by the premature filing of the suit, thereby causing them to expend time, effort, and money to address issues relative to exhaustion during the discovery process and portions of their Motion for Summary Judgment. And, of course, contrary to Plaintiffs' assertion,

dismissing a case causes it to be terminated, not merely paused. In addition to the *Pace*

considerations, dismissing a case followed by refiling incurs additional legal work by both the

opposing party as well as this court to bring it up to the summary judgment stage.

It boggles the imagination to come up with a good reason why Plaintiffs filed this motion

to dismiss, purportedly to permit Plaintiff Roy Fluker to exhaust and refile, only after Defendants

have filed their motion for summary judgment. Plaintiffs instead could have taken a few hours to

file an administrative grievance at any time in the prior 15 months, which would have aptly

demonstrated that he had indeed exhausted his remedies in good faith.[3] The only conclusion that

this court can come to is that Plaintiffs are engaging in dilatory practices. That will not be

permitted. Accordingly, Plaintiffs' Motion to Voluntarily Dismiss (#69) is denied.


**Motion for Summary Judgment**

In the First Amended Complaint, Plaintiffs make four claims. First, they allege that the

County of Kankakee and the Kankakee County Sheriff's Office acted in a willful and wanton

---

[3] Regarding the first novel argument raised in Plaintiffs' Reply, which is that "having less than 25 days to file a grievance—25 days in which Mr. Fluker was on narcotic pain medication convalescing from major surgery and restricted in his daily activities" was "unreasonable", they do admit that he had 25 days where the administrative procedure was not "unavailable". Plaintiffs apparently argue that the grievance process was *constructively* unavailable because he was recovering from surgery. Given the dearth of any precedent for this proposition, this opinion cannot go so far.

Regarding the second argument that the JCDC Inmate Handbook cannot simultaneously apply and not apply to him, Defendants' position appears to be that the Inmate Handbook's grievance procedures applied to Plaintiff while he was housed at the JCDC, and now that he is no longer housed there, he may no longer avail himself of those procedures (and hence, those procedures are "unavailable"). Contrary to Plaintiffs' exhortations, such an interpretation is not nonsensical. Further, Plaintiff's argument does not excuse his failure to attempt to exhaust. Plaintiffs argue that he should be permitted to voluntarily dismiss and attempt to exhaust; they do not argue that it would be futile to try. Even if they did argue as much, "[e]xhaustion is necessary even if… the prisoner believes that exhaustion is futile." *Dole v. Chandler*, 438 F.3d 804, 808-09 (7th Cir. 2006).

manner in violation of state law when they negligently operated the transport van, failed to

seatbelt Plaintiff, delayed in taking him to get medical treatment, and failed to have proper

policies for securing inmates by seatbelt and proper procedures for dealing with medical

emergencies during inmate transportation. Second, they allege that certain officers employed by

Defendants acted pursuant to a widespread practice that deprived Plaintiffs' Eighth Amendment

rights, by acting with reckless and deliberate indifference in total disregard for the safety and

constitutional rights of the Plaintiffs. Third, they allege that Debra was deprived of, and is

reasonably certain to be deprived of in the future, the support, society, and companionship of her

husband at the time of any communication and/or visit in prison and beyond the period of

Plaintiff's incarceration, as a result of Defendants' willful and wanton conduct, pursuant to state

law. Last, they claim that Plaintiff Debra suffered loss of consortium under 42 U.S.C. § 1983.

This final claim has already been dismissed and will not be discussed further.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In ruling on a motion for

summary judgment, a district court has one task and one task only: to decide, based upon the

evidence of record, whether there is any material dispute of fact that requires a trial. *Waldridge v.*

*Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). In making this determination, the court

must construe the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986*); Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir.

2010). However, "[o]nly disputes over facts that might affect the outcome of the suit under the

- 16 -

governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004). If it is clear, based upon the undisputed facts, that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only proper, but mandated. *See Padula v. Leimbach,* 656 F.3d 595, 600–01 (7th Cir. 2011).

**A. Constitutional claims**

Plaintiffs commingle a variety of claims and fail to distinguish the source of law under which they allege each set of facts, making their allegations difficult to analyze. However, reading the complaint and facts liberally, it appears that Plaintiffs have three categorical allegations. First, they argue that either the correctional officers failed to seatbelt Plaintiff; or that the correctional officers failed to inform Plaintiff of his right to request to be secured by seatbelt; or that there was no policy or practice requiring officers to do either. Second, they argue either that the correctional officer driving the van did so recklessly and with deliberate indifference to Plaintiff; or that there was a policy or practice to do so; or that there was a policy or practice to do so while inmates were not secured by a seatbelt. Last, they argue that after the accident, either the correctional officers were deliberately indifferent to Plaintiff's serious injury; or that there was a policy or practice the adherence to which required correctional officers to engage in deliberate indifference to his serious injury.

*i. Source of law and legal standards*

The Eighth Amendment protects individuals from the imposition of "cruel and unusual punishments", U.S. CONST. AMEND. XIII. That constitutional protection "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society," *Trop v. Dulles*, 356 U.S. 86, 101 (1958). However, the Eighth Amendment does not "require the most intelligent, progressive, humane, or efficacious prison administration." *Lee v. Young*, 533 F.3d 505, 511 (7th Cir. 2008). Negligence on the part of an official does not violate the Constitution, and it is not enough that he or she should have known of a risk. *Pierson v. Hartley*, 391 F.3d 898, 902 (7th Cir. 2004). "Instead, deliberate indifference requires evidence that an official actually knew of a substantial risk of serious harm and consciously disregarded it nonetheless." *Id*.

In the medical context, the Eighth Amendment requires that "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Similarly, in regard to humane conditions of confinement, "a prison official cannot be found liable… unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Thus, the general standard of a cognizable Eighth Amendment claim is that 1) there is a serious medical need or excessive risk to inmate health or safety of Constitutional proportions; 2) the official is subjectively aware of that need or risk; and 3) the official consciously disregards that need or risk of harm. *Farmer*, 511 U.S. at 839-840.

*ii. Failure to exhaust*

The Prison Litigation Reform Act requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). A threshold question is whether the presence and deployment (or lack thereof) of seat belts in a prison transport van or the quality of medical treatment in response to an injury qualifies as a "prison condition". Although Section 1997e does not specifically define what qualifies as a prison condition, the Seventh Circuit has adopted the definition in 18 U.S.C. § 3626(g)(2) as applying to § 1983 actions. *Witzke v. Femal*, 376 F.3d 744, 750 (7th Cir. 2004). There are three elements to a complaint about a "prison condition": (1) it must relate to the conditions of confinement in any jail, prison, or other correctional facility; (2) the plaintiff must be confined; and (3) that confinement must be in any jail, prison, or other correctional facility. *Id*. at 752. The parties do not disagree that Plaintiff was a detainee at the JCDC at the time of the incident, and that the JCDC was a jail, prison, or other correctional facility.

Regarding the medical treatment issue, it is clear that "complaints about medical treatment in prison are complaints about prison conditions."*Witzke*, 376 F.3d at 751 (internal quotation marks omitted). The seatbelt issue is less clear because a transport van is not a "jail, prison, or other correctional facility" and there is no Seventh Circuit precedent on whether a "transport vehicle" constructively constitutes a "jail, prison, or other correctional facility". However, "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege

excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Other district courts outside this circuit have treated challenges involving the absence of seatbelts or, when available, the failure to fasten them, as covered by the PLRA.[4] Similarly, this court treats a challenge to the availability or deployment of seatbelts in a prison transport vehicle as a "condition of confinement".

     "In order to exhaust administrative remedies, a prisoner must take all steps prescribed by the prison's grievance system." *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004). Following these steps means that "a prisoner must file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). A prisoner must demonstrate that he has exhausted his administrative remedies, "even if the prisoner is requesting relief that the relevant administrative review board has no power to grant, such as monetary damages, or if the prisoner believes that exhaustion is futile." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *see also Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).

---

[4] *See, e.g.*, *Young v. Hightower*, 395 F. Supp. 2d 583 (E.D. Mich. 2005); *Carrasquillo v. City of New York*, 324 F. Supp. 2d 428, 436 (S.D.N.Y. 2004); *Johnson v. Thaler*, CA V-10-025, 2012 WL 1202138 (S.D. Tex. Apr. 9, 2012) (unpublished); *Hogan v. LeBlanc*, CIV.A. 10-495-RET-SC, 2010 WL 5563542 (M.D. La. Nov. 12, 2010) *report and recommendation adopted*, CIV.A. 10-495-RET, 2011 WL 149316 (M.D. La. Jan. 10, 2011) (unpublished); *Duclos v. Ramirez*, 07-CV-1805 W (JMA), 2009 WL 667205 (S.D. Cal. Mar. 13, 2009) (unpublished); *Herrera v. Poveda*, EDCV08356ODW(PLA), 2008 WL 5103204 (C.D. Cal. Nov. 25, 2008) (unpublished); *Clark v. Sumter Cnty.*, 9:07-CV-0791-GRA-GCK, 2008 WL 350480 (D.S.C. Feb. 7, 2008) (unpublished).

The JCDC Inmate Handbook permits inmates to "submit grievances or complaints regarding any incident, condition, treatment, or other matters pertaining to the facility rules and regulations," and requires that they "must be written on an Inmate Grievance form". (#63 exh. O p. 22). The Handbook further notes that "[a]n Inmate Grievance will be responded to in writing normally within seven (7) days, or when reasonably practical and necessary." *Id*. Finally, the Handbook describes an appeal procedure, in which a letter may be submitted to the Illinois Department of Corrections Jail and Detention Standards Unit, if the grievance is not answered to the inmate's satisfaction. *Id*. Plaintiffs have provided no evidence that they have exhausted their administrative remedies by filing a grievance. In fact, as discussed earlier, Plaintiffs admit that they have not submitted a grievance, and seek to voluntarily dismiss in order to satisfy the exhaustion requirement. To the extent that Plaintiffs claim that they have not exhausted their remedies because those procedures were unavailable or futile, Plaintiffs have not even alleged that they have *attempted* to exhaust. Because this opinion has already denied Plaintiffs' Motion to Voluntarily Dismiss as untimely, and because the parties do not dispute that Plaintiff failed to exhaust his administrative remedies, summary judgment must be granted to Defendants on this ground alone. Out of an abundance of caution, this opinion proceeds with the merits of Plaintiffs' claims.

*iii. Individual vs. municipal liability under* Monell v. Dep't of Social Services

Plaintiffs have named only two municipal entities, the County of Kankakee and the Kankakee County Sheriff's Office. They have attempted to amend their complaint to add individual defendants, (#68), but as discussed above in Part I, the Magistrate Judge denied that

motion, (#79), and this court has denied their objection, (#81). "A municipality cannot be held liable *solely* because it employs a tortfeasoror, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) (emphasis in original). Instead, a local government may be held liable "when implementation of its official policies or established customs inflicts the constitutional injury." *Id.* at 708. "Misbehaving employees are responsible for their own conduct, units of local government are responsible only for their policies rather than misconduct by their workers." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (internal quotations marks omitted). To establish municipal liability under *Monell*, a plaintiff must produce evidence of "(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Id.* Thus, Plaintiffs must show both (1) a policy or practice that, when enforced, results in a constitutional injury; and (2) that they suffered a constitutional injury.

### iv. Failure to secure inmates in seatbelts and operation of prisoner transport van

Plaintiffs' first claim is in relation to Defendants' failure to fasten his seatbelt. Although Plaintiffs' allegations are unclear, they appear to claim either that Defendants should have fastened his seatbelt for him; or should have informed him that he had could request the correctional officers to fasten his seatbelt; or failed to have had a policy or practice to fasten his seatbelt. Under *Monell*, only the last of these claims may be brought pursuant to § 1983 because

his motion to add individual defendants was denied as untimely. However, all those claims, including the ones that would have been brought against individual defendants were this court to have permitted they be added, may be denied on the ground that the failure to seatbelt an inmate while being transported in a prison vehicle in and of itself neither creates an "excessive risk to inmate health or safety" nor demonstrates a "deliberate indifference to serious medical needs". Neither party has proposed and this court cannot find any case holding that prisoners have a constitutional right to being secured while in transit. Rather, the contrary appears to be true. The Second, Eighth, and Eleventh Circuits have held that the failure to provide an inmate with a seatbelt does not, standing alone, give rise to a constitutional claim. *Jabbar v. Fischer*, 683 F.3d 54, 58 (2d Cir. 2012) ("the failure to provide a seatbelt is not, in itself, 'sufficiently serious' to constitute an Eighth Amendment violation"); *Spencer v. Knapheide Truck Equip. Co.*, 183 F.3d 902, 906 (8th Cir. 1999) ("[W]e do not think that the [municipality's] purchase of patrol wagons without safety restraints nor its manner of transporting individuals in these wagons were policies that obviously presented a 'substantial risk of serious harm.'"); *Smith v. Sec'y For Dep't of Corr.*, 252 F. App'x 301, 304 (11th Cir. 2007) (unpublished) (refusing to hold that "riding in a van equipped with the manufacturer's car seats, seat belts, and windows is a necessity, such that riding in a van without these characteristics is a deprivation of the minimal measure of life's necessities or is something that modern society would find intolerable," and that doing so was not a "sufficiently risky condition" for an Eighth Amendment violation).

        In their Response, Plaintiffs do not provide any case law for this proposition, but rather, argue that *the combination* of failing to seatbelt an inmate in combination with a correctional officer driving recklessly is sufficient to state a § 1983 claim. Plaintiffs cite to *Taylor v. Stateville*

*Dep't of Correction*, 10 C 3700, 2010 WL 5014185 (N.D. Ill. Dec. 1, 2010) (unpublished),

*Goods v. Navarro*, 09 C 7406, 2012 WL 1021807 (N.D. Ill. Mar. 26, 2012) (unpublished), and

"*Bankston v. Dar*, 2012 U.S. Dist. LEXIS 91573 (N.D. Ill. 2012)"[5] (unpublished). These cases

do not even provide persuasive authority. *Taylor* is an opinion before that court on a 28 U.S.C. §

1915A merit review hearing and therefore is not only unpublished but also dicta. *Goods* is also

unpublished and dicta. And in *Bankston*, the court in fact dismissed the case for failure to state a

claim. These are hardly situations where, as counsel claims, "courts have routinely recognized

the viability of 1983 claims where the plaintiff was not seat belted where the defendants were

driving recklessly." (#70 p. 42). Such statements strain credulity.

The only case with precedential merit to which Plaintiffs cite (and to which the *Taylor*

and *Bankston* opinions refer) is *Brown v. Fortner*, 518 F.3d 552, 556 (8th Cir. 2008). In *Brown*,

the plaintiff-inmate specifically requested that he be secured with a seatbelt, and the named

defendant correctional officer affirmatively refused to do so. *Id.* at 559. There was also evidence

that the defendant "was driving in excess of the speed limit, following too closely to the lead

van, crossing over double-yellow lines, and passing non-convoy cars when the road markings

clearly prohibited doing so," and that when "the inmates riding in [the] van asked him to slow

down, [the defendant] ignored their requests." *Id.* The court in *Brown* concluded as follows:

---

[5] By neglecting to include either the unpublished opinion's docket number or the date of the opinion, and by calling the named defendant "Dar" when the defendant's correct last name was "Dart", counsel put this court at significant trouble to find *Bankston v. Dar[t]*. (In counsel's defense, that opinion itself incorrectly lists the defendant's name as "Tom Dar". The Northern District's docket correctly identifies that defendant as Thomas Dart.) The text of the opinion that counsel cites cannot be found in Westlaw or in Google Scholar. This court was only able to find and review the case by manually looking for the parties in the Northern District's docket. The correct citation is *Bankston v. Cook County Jail*, No. 12-CV-4843 (N.D. Ill. July 2, 2012).

- 24 -

> The uncontested evidence indicates [the correctional officer] knew [the inmate] was shackled and restrained in a manner that prevented him from securing his own seatbelt. Nonetheless, [the correctional officer] rejected [the inmate's] request for a seatbelt. [The correctional officer] drove recklessly and ignored requests by the inmate passengers in his van for him to slow down. From this evidence, a reasonable jury could conclude that there was a substantial risk of harm to [the inmate] and that [the correctional officer] knew of and disregarded the substantial risk harm.[6] As such, [the inmate] has presented sufficient evidence that [the correctional officer's] actions may have violated the Eighth Amendment prohibition against cruel and unusual punishment.

*Brown*, 518 at 560. But of course this is so. *Brown* stands for nothing more the unexceptional proposition that a correctional officer who subjectively knows about a substantial risk of harm to the inmate and acts with deliberate indifference to that risk may violate the Eighth Amendment. *Brown* is not about whether an inmate has a constitutional right to be secured by seatbelt. Rather, the affirmative refusal to secure the inmate was merely part of the evidence that the officer was subjectively aware of a substantial risk of harm to the inmate, and the subsequent reckless driving was part of the evidence that he consciously disregarded that risk of harm.

Suppose, for example, that a correctional officer knows that an inmate is deathly allergic to bee stings. The inmate discovers that a squadron of angry bees has chosen to build their new home in his cell and requests that either he or the bees be moved. The officer neither moves the inmate nor removes the nest, and the inmate is subsequently stung and has an anaphylactic reaction. It would not be unreasonable to say, in that situation, that the correctional officer is liable because he knew of and disregarded a substantial risk of harm, but it would be puzzling to say that the officer is liable because inmates have a constitutional right not to have bees around

---

[6] So in original. Probably should be "knew of and disregarded the substantial risk of harm".

them. Accordingly, this court cannot hold, as a matter of law, that inmates have a constitutional

right to be secured by seatbelt or, for that matter, a right to be informed that they may request to

be seatbelted.

More critically, though, the correctional officer was a named defendant in *Brown*. Neither

officer is named in the present action. Thus, pursuant to *Monell*, Plaintiffs must argue that there

was a policy or practice to refuse to secure inmates with seatbelts. Plaintiffs fail to demonstrate

that there was such a policy or practice. To the extent that Plaintiffs treat the claim as though the

officers had been named, they have not demonstrated that either officer was subjectively aware

that Plaintiff would be placed at a substantial risk of harm of injury from not being secured or

that Meehan intentionally disregarded that risk of harm, and any such claims fail on that ground.

Plaintiff did not request to be secured in the seatbelt and Meehan and Montalvo did not refuse to

secure him in the seatbelt. Finally, even if this court takes Plaintiffs' facts to be true that Meehan

was driving above the speed limit, driving in violation of the posted speed limit, by itself, is not

sufficient to constitute reckless driving under state law. *People v. Potter*, 125 N.E.2d 510, 513

(Ill. 1955) ("[D]riving in excess of the speed limit…does not [alone] constitute criminal

negligence, nor does it constitute willful and wanton misconduct."); *People v. Ziegler*, 396

N.E.2d 1160, 1165-66 (Ill. Ct. App. 1st Dist. 1979) (noting that willful and wanton misconduct

during driving was demonstrated by evidence that the driver changed lanes in a reckless and

dangerous manner; cut off of other cars; approached a standing vehicle with brake lights and turn

signal functioning without any attempt to reduce speed; and failed to apply brakes despite more

than ample warning). Thus, Plaintiffs either fail to state a claim upon which relief may be

granted, or have failed to provide any facts supporting their allegation of a policy or practice of

deliberate indifference to a serious medical need or substantial risk of harm. Accordingly,

summary judgment is granted on this claim.

### v. Deliberate indifference to a serious medical need

Plaintiffs also claim that the medical care that he received following the incident violated

his constitutional rights. Plaintiffs argue, as follows:

> Mr. Fluker has testified that upon Defendant slamming on the brakes, he flew
> forward head-first into the steel cage and immediately began bleeding from
> his head. He then immediately cried out for help. It was obvious to the other
> inmate, Eric Ollison, that Mr. Fluker need medical attention because he had a
> lot of blood coming out of his head and could not get himself up off the floor
> of the van. Yet, despite the facts that the officers could see Mr. Fluker
> bleeding from the head and lying on the floor helpless, they continued to
> drive. At the time the van made the sudden stop, the correctional officers had
> heard a loud thump in the back of the van and then saw Mr. Fluker lying there
> and bleeding from the head. Even a child, maybe 7-years-old, could see Mr.
> Fluker needed medical attention. Common sense dictated this. In fact, the
> officers actually acknowledged this when they ordered Mr. Fluker not to
> move. Clearly a reasonable person could find that Defendants were
> deliberately indifferent to Mr. Fluker's medical condition when they observed
> him wedged there on the floor, bleeding from the head, crying out for help.
> Correctional officer Matt Meehan even admits to seeing Mr. Fluker's face and
> the obvious expression of pain. But all the correctional officers did was tell
> Mr. Fluker not to move and continued to drive for approximately 10 minutes
> (which would have forced him to move around even though he was told not to
> move).
>
> [ * * *]
>
> Defendants saw that Mr. Fluker was bleeding from a head laceration and,
> based upon the circumstances (an abrupt stop of the van and a loud thump
> from the back passenger area of the van) could easily surmise that Mr. Fluker
> had suffered a significant trauma to his head, actually to the top of the head
> from where they saw the blood coming. They could also see that Mr. Fluker
> was in obvious pain and was unable to do anything to help himself. Yet,
> instead of stopping the vehicle so as to prevent further injuries and to assist
> him, they continued to drive for approximately 10 minutes. Thus, Defendants

were well aware from their own observations that Mr. Fluker was in need of
immediate medical care and they disregarded this need.

(Plaintiffs' Response to Motion for Summary Judgment, #70 pp. 43-45). The parties agree that

Montalvo called Lieutenant Smith at 4:30pm, within a minute of the accident, (#63, #70 ¶ 40);

that Meehan and Montalvo took 7 to 10 minutes to continue driving back to the jail, (#63, #70 ¶

44); that neither Meehan nor Montalvo had any medical training other than basic first aid (#63,

#70 ¶ 50); that Tatum, a trained and certified first responder, cleaned and bandaged Plaintiff's

head injury upon his arrival at the jail, (#63, #70 ¶¶ 53, 58); and that within 10 to 15 minutes of

arriving at the jail, Plaintiff was transported to Provena St. Mary's Hospital, arriving at 5:11pm,

(#63, #70 ¶¶ 62-63).

　The crux of Plaintiffs' argument, although not clearly stated, appears to be either that

Meehan and Montalvo were deliberately indifferent to Plaintiff's serious medical condition, (#70

p. 44); or that Meehan and Montalvo failed to follow JCDC policy, which allegedly required

correctional officers to call 911 for backup and to call for an ambulance in the event of an injury

to an inmate during vehicle transport, (#70, p.41). As discussed earlier, because Plaintiffs failed

timely to add any individual defendants, they may only pursue a *Monell* action against the named

municipal defendants. Plaintiffs do not allege that any of Defendants' official policies or

established customs led to the injury that Plaintiff suffered. On this ground alone, summary

judgment may be granted.

　Assuming, for the sake of argument, that Meehan and Montalvo had been named as

defendants, Plaintiffs' claims still fail because they would have to demonstrate that the officers

had been deliberately indifferent to a serious medical need. Neither medical malpractice nor a

mere disagreement with the course of the inmate's medical treatment constitutes an Eighth Amendment claim of deliberate indifference. *Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Instead, a plaintiff must demonstrate that correctional officers "intentionally disregard a known, objectively serious medical condition that poses an excessive risk to an inmate's health." *Gonzalez v. Feinerman*, 663 F.3d 311, 313 (7th Cir. 2011). First, immediately after the emergency stop, Meehan and Montalvo recognized that while Plaintiff was in pain and was bleeding copiously from a head wound, he was also breathing, moving, and talking. (#72 ¶¶ 32-36). Meehan and Montalvo were not medically trained, so they requested guidance from Lieutenant Smith. Smith indicated that "[i]t would have been a different situation if Mr. Fluker had been unconscious or not breathing and in that situation, life-threatening, and correctional officers would have the discretion to take him to the hospital or call for an ambulance." (#72 ¶ 71). There is no evidence that Meehan, Montalvo, or Smith were aware of any facts that could have led to the inference that Plaintiff had suffered a vertebrae fracture, much less that they had actually drawn that inference. From the evidence presented to this court, there is no genuine issue of material fact that any of the correctional officers subjectively knew that Plaintiff had suffered any injury that posed an excessive risk of danger to his health.

Second, there is no evidence that any correctional officer intentionally disregarded Plaintiff's injury. Meehan called Smith within a minute of the incident. Plaintiff was taken directly to see the qualified first responder, Officer Tatum. Tatum sent Plaintiff directly to the hospital. Approximately 40 minutes elapsed between the onset of the injury and arriving at a hospital. It is not inconceivable that an ambulatory non-prisoner involved in a minor automobile accident could wait a substantially similar amount of time to see a physician if he went to the

hospital on his own volition, especially with some emergency rooms in major metropolitan areas requiring long wait times to reach the triage nurse, much less the ER physician. From the evidence presented, there is no genuine issue of material fact that any individual correctional officer had been deliberately indifferent to Plaintiff's injury.[7] Accordingly, summary judgment is granted on this claim.

## B. State claims

This court has supplemental jurisdiction over Plaintiffs' state-law claims, pursuant to 28 U.S.C. § 1367. See *Niehus v. Liberio*, 973 F.2d 526, 534 (7th Cir. 1992) (permitting the joinder of a state-law claim for loss of consortium with the spouse's constitutional claim).

### i. Willful and wanton conduct

Under Illinois law, there is no separate and independent tort of willful and wanton conduct. *Krywin v. Chicago Transit Auth.*, 938 N.E.2d 440, 452 (Ill. 2010). Instead, it is

---

[7] Because Defendants assumed that Plaintiffs would not prevail in their motion to add individual defendants, they neglected to brief whether any of the correctional officers were entitled to qualified immunity. Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Anderson v. Creighton*, 483 U.S. 635, 638 (1987). The inquiry is whether (1) the facts alleged, taken in the light most favorable to Plaintiff, show that Defendant violated a constitutional right; and if so, (2) whether the right was clearly established at the time of the alleged injury. *Payne v. Pauley*, 337 F.3d 767, 775 (7th Cir. 2003). Regarding the second prong, "[t]he relevant, dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Leaf v. Shelnutt*, 400 F.3d 1070, 1080 (7th Cir. 2005). Plaintiff may point to "a clearly analogous case establishing a right to be free from the specific conduct at issue" or that "the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009). Although this court cannot so hold, due to the lack of briefing, the facts suggest that Meehan, Montalvo, Tatum, and Smith would be entitled to qualified immunity.

"essentially an aggravated form of negligence, regarded as a hybrid between conduct considered negligent and conduct considered intentionally tortious." *Sparks v. Starks*, 856 N.E.2d 575, 577 (Ill. Ct. App. 1st Dist. 2006). Willful and wanton conduct is "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210; *see also Pfister v. Shusta*, 657 N.E.2d 1013, 1016 (Ill. 1995). "[T]he willful and wanton standard is remarkably similar to the deliberate indifference standard." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (editing marks omitted); *Chapman v. Keltner*, 241 F.3d 842, 847 (7th Cir. 2001). Accordingly, without adequate evidence of deliberate indifference by the correctional officers, Plaintiffs' state law willful and wanton claim necessarily fails as well.

In the alternative, Illinois statute requires that

> Neither a local public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, knows from his observation of conditions that the prisoner is in need of immediate medical care and, through willful and wanton conduct, fails to take reasonable action to summon medical care.

Illinois Local Governmental and Governmental Employees Tort Immunity Act, 745 ILCS 10/4-105. Further, Illinois statute requires that "[a] local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable," 745 ILCS 10/2-109. Although Plaintiffs argue that this section does not apply because there is a genuine issue of material fact that Defendants did act with deliberate indifference, as discussed earlier, this court disagrees. There is no genuine issue that Meehan and Montalvo were not subjectively aware of an injury causing excessive risk to Plaintiff's health, and even if they were, because he

was immediately brought to Tatum and then the hospital, there is no issue that they did not

consciously disregard that risk. Accordingly, summary judgment is granted on this claim.


      *ii. Loss of consortium under Illinois common law*

      Both parties agree that Plaintiff Debra's consortium claim is derivative of the claims

asserted by her husband Plaintiff Roy. Defendants cite to *Monroe v. Trinity Hosp.-Advocate*, 803

N.E.2d 1002, 1005 (Ill. Ct. App. 1st Dist. 2003) and *Hess v. Kanoski & Assoc.*, No. 09-3334,

2011 WL 924843 (C.D. Ill. Mar. 11 2011) for the proposition that "when an injured spouse

cannot prevail on any of his claims, neither can his wife prevail under a consortium theory", (#63

p.25). Plaintiffs agree. This court does not agree with the parties' reading of *Monroe*. *Monroe*

clearly states that "[a]lthough a loss of consortium action is necessarily predicated on the claim

of a directly injured spouse in that it arises from the same operative facts, it is legally separate

and distinct from the directly injured spouse's cause of action." *Monroe*, 803 N.E.2d at 1005.

There, an individual received surgery to correct a condition with his penis. After the surgery was

completed, he married the plaintiff. After the husband-patient recovered from the surgery, he

found that he was unable to consummate the marriage. The husband alleged that the defendants'

negligence resulted in personal injuries, and the wife alleged that she suffered loss of consortium.

That court held only that the wife's action was not permitted, because "[a]t the time of

defendants' alleged negligent conduct of which [the wife] complains, there was no marital

relationship," and thus, the "complaint fails to establish a duty owed to her by defendants." *Id*.

The holding in *Monroe* is only that because "consortium involves the rights and privileges

inherent in the marital relationship,… where no marital relationship exists, a defendant cannot

owe a duty to refrain from interfering in the relationship…. Where there is no duty, there can be no recovery in a tort for negligence." *Id.* Here, the parties agree that a marital relationship existed at the time of the injury and still exists. The facts in *Monroe* thus make it inapposite, and *Hess* merely cites to *Monroe*.

Contrary to both parties' asseverations, a loss of consortium claim is not *always* derivative of the spouse's underlying cause of action. Rather, "although actions for personal injuries and actions for loss of consortium may derive from the same operative facts, they are legally distinct." *Mitchell v. White Motor Co.*, 317 N.E.2d 505, 507 (Ill. 1974); *see also Schrock v. Shoemaker*, 640 N.E.2d 937, 941 (Ill. 1994) ("[A]n action for loss of consortium is not a derivative claim brought by the spouse as the personal representative of the employee, but is an independent action to recover for injuries the spouse has suffered, such as loss of support and loss of society."); *Vickery v. Westinghouse-Haztech, Inc.*, 956 F.2d 161, 162 (7th Cir. 1992) ("a wife possesses a right of consortium in her own right; it is not a right of her husband which she obtains derivatively, as by inheritance.").

In *Blagg,* the Illinois Supreme Court did hold that recovery from a loss of consortium claim is limited by the injured spouse's comparative negligence, thereby making it appear "derivative". *Blagg v. Illinois F.W.D. Truck & Equip. Co.*, 572 N.E.2d 920, 926-27 (Ill. 1991). However, in *Mitchell*, the same court previously permitted a loss of consortium claim to proceed even though the underlying tort claim was barred by the two-year limitation on tort actions, because a loss of consortium claim was subject to the general five-year limitations on civil actions. *Mitchell*, 317 N.E.2d at 507. In that case, loss of consortium might therefore be considered "direct". Thus, whether the loss of consortium claim is direct or derivative depends

on the underlying basis for allowing or precluding the claim. Here, Debra's claim can be considered derivative because her claims are precluded by the same legal barriers as Plaintiff Roy Fluker's. Plaintiff cannot recover in his state willful and wanton action because his claim is precluded by his inability to demonstrate that the correctional officers engaged in willful and wanton conduct and the Illinois Tort Immunity Act. Debra, as co-plaintiff, is similarly barred.

Furthermore, this court notes that the parties agree that Plaintiff was a prisoner at the time of the incident and is still currently a prisoner. The Federal Bureau of Prisons website indicates that his projected release date is February 8, 2024. Under Illinois law, "the basis for recovery for loss of consortium is interference with the continuance of a healthy and happy marital life and injury to the conjugal relation." *Blagg*, 572 N.E.2d at 926 (Ill. 1991) (editing marks omitted). "When one spouse (the impaired spouse) is injured by the negligence of another, the other spouse (the deprived spouse) may recover from the tortfeasor for the loss the deprived spouse suffered by virtue of the impaired spouse's injury. This loss, generally labelled [sic] a loss of consortium, includes material services, elements of companionship, felicity (*i.e.,* happiness), and sexual intercourse, all welded into a conceptualistic unity." *Malfeo v. Larson*, 567 N.E.2d 364, 369 (Ill. Ct. App. 1st Dist. 1990). "A loss of consortium can therefore be as minor and transient as a wife's losing a month's help from her husband in mowing the lawn and washing the dishes and grooming the cat, and as major as the loss of all spousal services consequent upon an injury that renders the injured spouse a human vegetable." *Niehus v. Liberio*, 973 F.2d 526, 533-34 (7th Cir. 1992) (internal editing marks and citations omitted). It would be difficult, if not impossible, to quantify the extent of any damages suffered by Debra.

Although we sympathize with Plaintiff's injury and condition, and regret the unfortunate circumstances that led to his injury, this court cannot find that facts of his case, as litigated by his attorneys, rise to the level of a constitutional deprivation. Finally, counsel for Plaintiffs is reminded of his duties under Fed. R. Civ. P. 11 and Illinois Rule of Professional Conduct Rule 3.1. Because all of Plaintiffs' claims have been resolved by this summary judgment, no reason remains to exercise the authority described by the Seventh Circuit in *Belleville Catering Co. v. Champaign Mkt. Place, L.L.C.*, 350 F.3d 691, 694 (7th Cir. 2003).

IT IS THEREFORE ORDERED THAT:

(1) Plaintiffs' Motion to Voluntarily Dismiss (#69) is DENIED;

(2) Plaintiffs' Objections (#81) are DENIED;

(3) Defendants' Motion for Summary Judgment (#63) is GRANTED.

(2) This case is terminated.

ENTERED this 10th day of May, 2013

**s/ Michael P. McCuskey**

MICHAEL P. McCUSKEY
U. S. DISTRICT JUDGE

- 35 -